Good morning. Good morning, your honors. Just a moment. Your honors, may it please the court, Hans Chen from the United States Department of Justice, representing the respondents of both Khoury and Priyam. Congress required mandatory detention for the petitioners in this case. When the alien is released. That is the language that is duty initiating, your honor. It is not time limiting. When I read this language, it's hard for me to see why Congress would use the English language in an unusual way. If my wife says, could you take out the garbage when you get home? It means, when I get home, not two weeks later. Now, it may mean a reasonable time after I get home. I can change out of my suit and put on blue jeans before I take out the garbage. But it doesn't mean two weeks later. I don't understand why this language that Congress used wasn't to protect the public from aliens just rattling around for years free, even though they were illegal and were criminals. It looks like what the government is supposed to do, according to Congress, is have a bus or a car outside the prison gate. And when the state says goodbye and they quit paying for incarceration, the feds say, hello, and put them in the truck or the bus. I don't see how else to read it. Well, your honor, two things. One, the government... Congress enacted an ambiguous statute, your honor. Congress enacted... I don't see the ambiguity. I mean, any more than my wife saying, could you take out the garbage when you get home? That's not ambiguous. It doesn't mean a couple weeks or years later. The ambiguity, your honor, arises in this manner. We have a statute, 1226C. It has two paragraphs. Paragraph two is the actual operative portion of the statute. It says that DHS must detain without bond criminal aliens, or it says aliens described in paragraph one, is what it actually says. And that clause of paragraph two is the heart of the ambiguity. The question then is, who are the aliens described in paragraph one? And reading it the government's way, though, reads out when the alien is released. Because the government's argument is that the individuals covered in paragraph one are the ones who were released from... Or who had the enumerated offenses, right? A through D. Where does the phrase, when the alien is released, come in under the government's reading? It's duty triggering, your honor. It's not time limiting. So when released becomes the earliest moment at which DHS's duty begins. It cannot take... And there's no end limit. The government, even though this is a mandatory detention provision, right, to which the government has no discretion, I take it that the government concedes that point. Correct, your honor. But the government can exercise that authority whenever it wants, whether it's 15, 20, 25 years later, is that the government's position? Our position, your honor, is that the government has a duty, as Justice Klinefeld pointed out, to take individuals into custody who committed the crimes enumerated at 1226C paragraph one. When does the government get to exercise that duty, whenever it wants, 20 years later for a misdemeanor offense? When it encounters aliens who have committed these crimes. But you say, when it encounters the aliens who've committed the crimes, and Congress says, when the alien is released. Why should you win saying, when we ask the question, when, with a different answer from the one Congress gives? Everybody's interested in when. When do you pick these criminals, aliens up? Congress says, when they're released from state jail, and you say, whenever we happen to get them. Our position, your honor, is that the system is not perfect, and Congress recognized that. In the Senate report that DeMore versus Kim Supreme Court case highlighted, Congress was concerned... That's why I used the phrase, reasonable time. Well, in that Senate... You could be heading over to the jail to pick somebody up when the state calls you, or their computer calls your computer, and says, this guy's getting out at 1201 AM on July 7th, and your guy gets out a little late, and he runs into some red lights, and he's late, so he has to chase around for the alien for a while. And that's why I think the when the alien is released has to be interpreted to be a reasonable time after. But any... You're saying it means that the answer to, when do they have to pick them up, is any time they catch them, and Congress says, when the alien is released. They said that, your honor, to make the earliest point at which Congress's duty begins. I think they said that to keep dangerous criminals, aliens off the street. And Congress recognized, your honor, that there will be cases like that which arose last week in San Francisco, in which DHS does not get the call. And if you do pick them up years later, it's not like you can't pick them up unless you win the interpretive fight today. You can pick them up. You just pick them up under subsection A, and you detain them. That's what subsection A says you can do. And you can either continue to detain them or release them on bond. The only difference with the subsection C pickups is they don't get out on bond. But you can pick these people up years later when you just happen to get around to it or catch them, and just have a bond hearing. And if they're dangerous or there's a risk of flight, the immigration judge or whoever adjudicates bond won't let them out. Congress imposed 1226C because it intended for criminal aliens to be held without bond, your honor. We cannot so easily hand wave away Congress's intent. So why didn't it say when the alien has been released? And why didn't they say bond in A? You're reading just... They could have said that in so many different ways. They could have said, if an alien has been released, you can go get them. But instead they say, when the alien is released. That really sounds like now, at the time they're released. The fact that Congress could have used clear language, your honor, does not obviate the ambiguity that arises from the language that it did use. Identify what is ambiguous. As I began to say, your honor, paragraph two says... Is is present tense and when designates a time. What is ambiguous? We don't know who is subject to mandatory detention. We don't know clearly from the statute whether it is solely the aliens described in sub paragraphs A through D. Why would that be though? Because two says described in paragraph one, and paragraph one includes when the alien is released. But not all of paragraph one is a definitional section, your honor. Why not? Paragraph one also contains language empowering the attorney general. It is partially a duty triggering provision, and it is partially a definitional section. And paragraph two only implicates the definitional portion of paragraph one. Tell me if I have some practical aspects of this right. My experience in the past has been that when an illegal alien is caught by state authorities, the state authorities use the national, some computer system, national criminal information system or something like that. And they find out it's an illegal deported alien, and the feds then send a form that says detain him when he finishes his time so we can pick him up. I can see where there could be some quarreling about that because the feds expect the state to just hold them in jail and continue to provide room and board till it's convenient for the feds to go and get them. And the states, either out of concern for the constitutional rights of the alien, or because they just don't wanna spend the money, say, nope, when his time is up, he's out, and that's your problem. Now, the feds would just as soon not be under that kind of time pressure, but it looks to me like this phrase, when the alien is released, says they are. Your honor, you asked about detainers. That's the document that the feds, the DHS would issue to the state and local governments. There were 10,000 detainers that were dishonored by state and local law enforcement officials last year. When you say detainers, do you mean informing the feds? They refuse to inform the feds or they refuse to hold the aliens after their time was up? It could be either, your honor, but... Well, it matters a great deal. As for refusing, I thought most of those were refusing to hold the alien after his time was up, and I don't, frankly, see how the state, if it has a duty to let him out of jail at 12.01 AM on July 7th, how it can hold him in jail just because the feds would like him to. There are cases, your honor, where the state and local authorities fail even to inform the federal government of an alien's imminent release. That happened last week in San Francisco. The alien was on state charges that were dropped. He was sent to the custody of the state officials with a detainer, and that detainer was not honored in the sense, your honor, that... Sounds like that's where you could get around your breach of Congress's instructions by saying, reasonable time. They didn't tell us, so we needed time to catch him. Congress knew, your honor, when it enacted 12.26 C, that these situations would happen. In that Senate report, it discussed its concern about aliens who left criminal custody and returned to the community. That was a scenario that they sought to encompass with the enactment of 12.26 C. Well, let's say you're right about that, because I think there's some practical implications to saying that... Setting statutory, plain language statutory construction aside, there's some practical implications to the notion that the feds have to be literally at the door of the state jailhouse when the alien is released and take him into immediate custody, right? But at the same time, we're trying to decipher the meaning of the word used in the statute, and I think you've gotta read it as a whole. And we've talked a lot about the phrase, when the alien is released, but there's language after that, and that is, regardless of whether they're released on parole or probation or supervised release. So if you're talking about what Congress was thinking, Congress was thinking that the federal government would get them fairly promptly, because Congress is trying to direct the government to the idea that you're taking them into federal custody for individuals who meet the enumerated offenses, and it doesn't matter whether they're released on probation or placed on supervised release or on parole, there's an end to parole, probation, supervised release. So shouldn't we incorporate all of that language to say, hey, that helps us understand what Congress meant when it says when the alien is released. And what Congress meant is that there's a pretty short time period, we don't know what that is. Reasonableness seems to be one option, but there is a short finite period that Congress contemplated. So how do you square that language with your reading, which is that that's the moment the government's obligation begins and we can get them whenever we encounter them? Your Honor, that language about parole and probation was enacted to prevent aliens from escaping the clutches of DHS and facing removal simply because they were on probation. I read that way. It reads like Congress wants them off the street. Congress did want them off the street, Your Honor. Congress says here, that the Attorney General has to take them into custody when they're released without regard to whether the release is on parole, supervised release or probation. That means they don't get to do their parole, supervised release or probation on the street. They do it in a federal jail. Congress wanted these individuals off of the street, but the reason it enacted 1226C was to prevent these individuals from reoffending and absconding during their removal proceedings once those removal proceedings began. And so it makes no sense, Your Honor, that Congress would also enact a counterproductive provision that would preclude that goal simply because of a gap in custody between criminal and immigration custody. What counterproductive provision? There is an individual who is placed into removal proceedings. He is a general alien. He has committed a crime enumerated in 1226C1A-D. He faces a higher risk than the general alien population of removal. He therefore has a higher risk of flight. Congress sought to counteract that higher risk of flight by enacting 1226C. But that goal is accomplished if you go get them immediately. And that's why that language when the alien is released, right? I think that that argument that you've raised in some sense undercuts your interpretation of the statute. I disagree, Your Honor, because an alien's flight risk is still elevated even if DHS failed to take the alien into custody immediately after his release from criminal custody. So just do him under A and deny bond. Your Honor... The only real difference is whether denial of bond is mandatory or discretionary. Correct, Your Honor. And by enacting 1226C, Congress sought to remove the discretion. Congress says no bond for these guys. Correct, Your Honor. No bond for these guys who are at a higher risk of flight because they are criminal aliens. Do you agree, counsel, that the risk of flight is reduced the longer a person stays in the community and develops ties and roots to the community? Your Honor, the government's position is that Congress did not make that a factor. Whether or not that... No, I'm following up on your point that these are serious flight risk individuals and that's why Congress made the mandatory detention provision apply to this category of individuals. So for those individuals who've committed the enumerated offenses, 20 years after the fact, if they've been... Other than their undocumented status law abiding, do you agree that the risk of flight is then mitigated or reduced? Your Honor, the Justice Department takes no position because that is not a relevant factor. Well, wait a minute. That's a yes or no. If somebody is in the community for a long time, despite having a prior conviction, and the government has to argue, let's say under A, risk of flight, wouldn't you agree that there's less risk of flight 20 years later than there was at the moment the alien is released from custody for the two responses, Your Honor? No, because the flight risk of an alien begins when he faces removal proceedings. That sounds kind of silly, actually, to me, as a practical matter. I mean, the ones that... Well, like you have in this case, they seem more like borrowers than flyers. Instead of flying away, they borrow down into the community and stay there for decades. They were borrowers until... Who is a criminal alien, until he gets... At this point, their adult lives are tied to the community they borrowed into. They're out there mowing their lawn or doing whatever else they do, and they're Californians. Until they receive notice that they face removal proceedings, Your Honor. And what prompts that other than an arrest? So what I'm wondering, as a practical matter, you might find these people because they're arrested again, at which point it would seem like under A, they've just been arrested for another crime, there's a pretty good reason to keep them and deny bond under A, combining the earlier crime with the new one. Are there other reasons that, as a practical matter, prompt you to find these people 20 years later and try to trigger this clause? DHS, when it detains these individuals, is not acting in bad faith. They are triaging who they can detain under fugitive enforcement actions. Many times, Your Honor, it is the hypothetical that you raised, where they come in on new offenses, not necessarily ones that fall under 1226 C1. But because they have committed those crimes in the past, they are then subject. We've actually taken you two minutes over your time. Sure, of course. I'm sorry to go over, but it's hard for me to get this out of my head, and I need to be instructed on it. We had a meeting some years ago with officials of the predecessor of the Department of Homeland Security, and we asked them what happens when somebody gets deported. And it turned out that what happened was nothing. They got papers saying, you were deported, go away. But nobody ever actually put them on a plane. All they got was paper, and often they didn't go anywhere, and they just stuck around and got caught over and over again. Is that still what happens? And is that how these cases come up, where aliens get detained for one thing or another years after being out in the community? Your Honor, there are multiple reasons why an individual might not be detained. To answer your hypothetical... Do you actually deport them? We do, Your Honor. We put them on a plane. There are forms for them to sign that they're being taken over the border if they're Mexican, or to sign that they're being put on a plane, Your Honor. Judging when to answer to your question about this hypothetical of the 20 years, there are two possibilities that your hypothetical raises. It's an extreme case. The first is that you allow the regulatory and statutory regime to stand. And to the extent that there are any due process claims that arise because the gap in custody, or there are other factors that indicate that the detention is not for a valid immigration purpose, because if it is, it satisfies due process. But if it is not, those individuals have an as applied challenge. I knew you were gonna say that, as applied challenge. And I have follow up questions for you, but I know we're gonna get to see you again in the next case for 20 minutes. I'm looking forward to it, yes. So I'm going to go ahead and save my follow up questions for the next case involving the same issues. And let's hear from Mr. Adams. May it please the court, I'm Matt Adams with Northwest Immigrant Rights Project on behalf of appellees and plaintiffs. Defendants' arguments repeatedly fell to place the mandatory detention provision in its statutory context. Focusing on it in isolation as if it exists independently of the general detention rule at 1226A. But the plain language of the statute makes clear that it is the exception to the general rule. And their interpretation not only ignores the overall statutory framework, but it contradicts its plain language and violates standard principles of statutory interpretation, in addition to raising serious constitutional concerns. It's remarkable that in the board's official interpretation in matter of Rojas, when they purport to look at the statutory framework, they do not even acknowledge 1226A. They don't even address it. Nor do they address the transition period custody rules, which was the introductory scheme, which also included a timing provision. Well, there's some ambiguity in that the government is not without a response that's arguable. Some courts have found ambiguity. And if you look at the word, when, does that mean immediate? Or does that mean maybe a couple of weeks? There's some ambiguity there in that language. So if that's the case, is this a Chevron deference case? Now, we'll get to that analysis. Hopefully, we'll have time to talk about that ambiguous. There's two points I'd make. First, the board did not find that that was ambiguous. They said the statute directs them to immediately take him into custody. It's only defendants' position here in litigation that they now assert there's ambiguity in the word, when. And the defendants are not allowed to supplement the rationale of the board with their litigation arguments. It's underscored by the fact that in matter of Rojas, if you look at the individual, he was taken into custody on the basis of the statute. The board didn't quibble with whether that meant he didn't fall under that immediacy requirement. Instead, they focused on the provision described in paragraph one, and then sought to read that provision by picking and choosing what parts of paragraph one they thought were necessary, even though paragraph one is one continuous sentence. And even though the Immigration and Nationality Act is replete with examples where Congress has described in, and then cites to a subparagraph or a subsection, the defendant's interpretation simply does not uphold the plain language of the statute. And talking about the plain language, again, this is an exception to the general rule. 1226A says, except as provided in subsection C, this general detention framework applies. Another primary rule of statutory interpretation is that exception must be approved. Now, defendants try to get around that by saying, well, we don't need to give it a narrow construction because it's ambiguous. But one of the reasons, of course, it's ambiguous is because they're failing to apply the rules of statutory interpretation. And more importantly, they're failing to look at it in the context of the overall... Back up a second. Where did it say the except was? In 1226A. It lays out the general rule for detention, and then says, except as provided in subsection C. Subsection C. The way this looked to me was, A is for illegal aliens generally, C is for illegal criminal aliens whose crimes are bad enough. C... Is that the structure? C is for a subset of individuals who are deportable. You say illegal, but of course, many of these individuals are lawful permanent residents who are now subject to deportability. So whether it's A or C, it's individuals who are potentially deportable. And then C focuses on a specific subset of individuals with criminal offenses who are taken into custody when released. Portable aliens, and A is possibility of bond for the run of the mill deportable alien, and C is no bond for the bad criminals among the deportable aliens. No bond for those deportable individuals who have these criminal offenses if they're taken into custody when released. And of course, Congress was seeking to prevent their release. The goal of that is to prevent risk of absconding and risk of danger to the community. So mandatory detention for aliens who are deportable or inadmissible because of the enumerated offenses in A through D, when they are taken immediately into custody upon release from a criminal custody. That's your reading of the statute. That's correct. And so if we accept that definition, does that mean literally, immediately, seamless transition from state to federal custody? Or is there some reasonable time period that's built into the definition of the statute? I think if you go into a reasonable time period, you're going beyond the plain language and necessarily coming up with some arbitrary divide, whether it's... As we said, the board accepted an immediacy requirement, and they found that an individual who had been picked up two days later wasn't immediately taken into custody. So you're saying then that if the Department of Homeland Security people who are driving over to the jail to pick up a guy at 1201 have a flat, and they don't get there till 10 after, quarter after 12, after they change the flat, that the criminal deportable alien now gets under A, where he may get bond, he's no longer under C. Is that what you're saying? That is true. But of course, at that bond hearing, the government would say, look, but for our flat tire, he wouldn't even have this bond hearing. And of course, he hasn't had the opportunity to reintegrate and establish those ties. Do you happen to know, is the government capable of doing what Congress told it to do? They absolutely are. And when we talk about the practical concerns at issue here, the government said there was, I believe, 10,000 detainers that are dishonored. That is certainly... Fails to advise... The detainer serves two as a courtesy, that they detain the individuals even 48 hours beyond the legal liability. But in addition, it instructs the local officials to notify ICE of their release date so that they can show up and pick them up. And that is precisely what they do. But he says they don't. He says there are a lot of them where they don't. So... Let me tell you about our class here. 40 miles south of here, you have the detention center with 1500 individuals who are locked up. About half of those individuals are subject to mandatory detention. And when the court issued its order, defendants submitted their report. And how many class members were there? 50. Only 50 of roughly 800 individuals were picked up at a later date. And then when they even went back through those 50 individuals, they found that some of them had been directly taken into custody, and others fell under different provisions. So it was even less than 50 individuals. Wait, I'm sorry, I'm not following what you mean. There were 50 individuals for whom the state did not notify the federal government? For whom the state did not immediately take custody of them at the jailhouse door. The state or the feds? I'm sorry, the feds. I misspoke, yes. And you're saying within those 50, some of them were because the feds hadn't been notified or none? No, even among those 50, it wasn't 50. It was more like 39 individuals that were taken into custody after returning to the community. The point is... Okay, so for those 39, were there any for whom the state had not told the federal government that they were going to be released? There's no evidence that there were any. It's a question of prioritization. The Department of Homeland Security just released its new program to replace renamed secured communities. And in that, they clarified that we're not gonna use detainers as much. Instead, we're gonna rely upon the notifications. Because indeed, we do have the resources to go and pick up individuals. Now, you might have the abstract case where an individual... Are the notifications automatic through a computer system? There's an automatic notification when anyone is booked into the system. So under NCI, which Judge referred to earlier, their immigration federal authorities are advised instantly when you have an immigrant who's processed, and then the immigration authorities can review the chargeable offense or past record. And do you know that that happened for those 39 people? That happens for everybody. There's no exceptions to that. So you have a factual disagreement about this? Because I think he's saying that's not true. I think what he's focusing on is a second notification where the government, then the federal government, requests that the local authorities provide notification of the time when they shall be released from the criminal charge. You're saying 100% the federal government is advised when they're taken into custody, but what we need to talk about now is an advice when they're about to be let out of custody. That's correct. And more of the misstatement from opposing counsel was that 10,000 detainers are not honored. That's absolutely erroneous. Because the vast majority of individuals do... Rather, the local officials provide the information when they're going to be released. And that's precisely how they take us... But you just said vast majority. So we have to deal with... I mean, we may have to answer the question of if we agree with you about the statutory interpretation point, we still have to figure out what does it mean to when released. I mean, even if we agree with you, there's some sort of immediacy. We might have to define immediacy. So it seems like you are saying there literally has to be a car sitting there or a person sitting there with their handcuffs. If we disagree and think, okay, well, maybe there could be some gap of some number of hours or something, we're trying to understand just practically what happens. And I still don't really understand what you're saying happens. So one more point that I would make is that 8 U.S.C. 1373 is another statute which precludes state or local officials from enacting any type of ordinance that the government that would prohibit them from notifying the federal government. So there's not a I think we're all struggling with the same factual issue. And if you don't know the answer, that's fine. But does the government get notified when someone is about to get released? So at 1201 today, we are releasing Mr. So-and-so so that they can have somebody send an ICE agent over to pick him up. And that was my point, or at least what I tried to demonstrate by talking about our class. 800 individuals are locked up because ICE was notified and the federal government was able to appear at the jail's doorstep and take the individual But maybe there are 800 people out mowing their lawn. I mean, no, but we know that's not the case. How? Because only 50 of them, because in the report that the government provided, only 50 of them fell within our class. That is to say, they were purportedly under mandatory detention, but they were not taken directly into custody immediately upon release. And that is how Judge Jones defined the class. So of those, only 50 of the 800 were individuals that were apprehended apart from the jail's door. Okay, so those are the ones, the 50, were apprehended. Maybe there are 10,000 others out mowing their lawn. How do we know there aren't? There's other individuals that certainly have been reintegrated with the community. Those 50 are but examples. Okay, but so for the 50, the ones who weren't apprehended immediately, can you tell us that for all 50, the state told the feds before they were released that they were about to be released? No, I certainly can't say that there wasn't an individual case. Why weren't they apprehended immediately? I think it goes back to their priorities. The government at times, there's, we talk about criminals, but it's... I don't know quite how to visualize this. My impression is that there are so many illegal aliens who get released from jail in the big cities that the government just sends over a bus at the release times. A little town like mine, Fairbanks, Alaska, every now and then it happens and the deputy marshals send a car over and 12.01 AM, the car's sitting there at the exit from the state jail and they take the guy as he passes through the gate. Have I got this wrong? How are the 50 out there? The 50 are out there because they weren't prioritized. I mean, ICE started out... I don't know what the word means now. We're talking bureaucratic speech. That means that ICE, when they looked at that individual, said, you know what, it's not worth our time to send someone for him. You mean they don't bother to pick him up even though Congress says to pick him up? They know about him? They've been informed? Well, you don't know the answer to that, it sounds like. You don't know whether they've been informed. I can't say with certainty that in any individual case they've been informed, but we do know that when we're looking at our class that, for example, King County Sheriff or the Yakima County Jail, they provide notification to ICE and ICE regularly on a daily basis sends individuals. I started out in Yakima County, another small jurisdiction, and there every day... Notifications that a non-citizen has been taken into custody. No, notification that that non-citizen is going to be released on such and such a date at such and such a time. Most jails have a convention, at least from what I've seen. Everybody gets out one minute after midnight so that they don't serve an extra day of their time. Does the notice come to the government within a couple of days before that? Yes. Yes, they receive it well in advance. In fact, I don't have the... I'll tip my tongue, but I believe they ask for a two-week advisal, two weeks prior to their release. And so just so I understand, I mean, have you taken discovery on this already or what's the situation with this litigation? Like, it sounds like you know there's a general practice, but you can't say that it happens in every individual case. I'm trying to figure out why that is. What's been the factual inquiry so far? That there's a general practice of whether the... There's no evidence that there's any jurisdiction here in Washington State that fails to provide notification to ICE authorities. But when you say that, your evidence is that every jail has some general practice of giving notification? That's right. And it's doing it on a routine basis. And you learned that through discovery in this case? And through our class members who are sitting in detention in Tacoma. But you haven't actually asked, like for the 50 people who weren't detained immediately, you haven't done some sort of discovery yet into what happened with them and whether there was a notification or not immediately before they were released? That's right. We don't have the... Have you tried to ask for that or what's happened so far in this litigation? Because it was presented as a pure issue of law, then there was no need for... The parties typically did no further discovery. So you can't tell us that the government did get notice for those 50 people before they were released and the government can't tell us that it did not get notice before they were released? That's correct. I can tell you as a practical matter on a day-to-day level, all of the facilities here, the state and local facilities, are providing notification to the government. So you're saying even though you can't tell for these 50 for sure and the government can't tell either for sure, the routine is that they get notice of everyone, but sometimes you put it in one of those government words, prioritize. It means they just don't bother to show up and get them. That is correct. On 40 or 50 people who weren't taken into the custody immediately, when they eventually were taken into custody, was it always because of a new crime? No. When you look at, for example, our named representatives, some of them were sent a notice to show up to the ICE office. Others have applied for an immigration benefit. I looked at your name and I couldn't quite tell. So literally, it's just out of the blue. Do you have any idea what prompted? I wondered if there was some crime you hadn't mentioned or something. What prompted these people to just all of a sudden, years later? Well, I don't want to be presumptive on behalf of the government, but what DHS does is continually refocuses or shuffles their priorities and engages in new systemic, I don't know, review of their databases. And sometimes during that, they say, you know what, these individuals are now a priority. And they actually know how to find them. But that implies that they knew how to find them all along. So like all of a sudden, now it's a priority and now they can find them. Yeah, oftentimes they go to their home or to their business where they're working. I mean, there's certainly isolated incidents where people abscond. They didn't do that before. I used to do that with routine witnesses and routine cases. Drive over to their house. The government doesn't do that? They still do. And in respect to one of your questions before, it's not as if people who have removal orders are simply let off scot-free. If they don't show up, then ICE sends agents to their house, arrests them, and then puts them on a plane to be deported. But when we're looking at the statutory interpretation, pursuant to the constitutional avoidance issues, we have to create a uniform construction of the statute. And if the statute can be read upon in its plain language as requiring that they be detained immediately upon their release from criminal custody, that's what this court may do. But if we read it as we read it immediately, it's not literally immediately seamless transition, then do you have a suggestion as to what that time period should be? I think if the court were not to accept that immediacy, and say, well, immediacy has some flexibility in that. If the government's able to demonstrate that they indeed attempted to take the individual into custody at the time of their release, but had, whether it's that flat tire or miscommunication, the jail released them a couple hours earlier, then the government still attempted to, made the effort to include them in the class. And so I think if there's any reasonableness interpretation, it still would require that the government bearing that burden of demonstrating that they attempted to fulfill that obligation. Incidentally, is there, the way I'm understanding this case, and I want to be corrected if I misunderstand, either kind of alien, the one who's caught immediately, or the one who's caught ten years later, can be caught and can be jailed. And the only difference is whether there's a bond hearing, or whether there's no possibility of being let out on bond. Is that true? That's true, and it brings up one very important point, that even at those bond hearings, the non-citizen still has the burden of demonstrating that they are not a flight risk. This is not some windfall, get out of jail free. So that's what I'm trying to find out. The person who, either because of government negligence, or because the state was trying to shelter the illegal alien from the feds, or whatever, doesn't get picked up immediately. It doesn't mean he can't get picked up and put in jail whenever the feds catch him. Absolutely. Is that right? That is the general detention rule. A criminal bond can be denied, even though he wasn't picked up when he was released. And in fact, in Tacoma... You could just keep him in jail under subsection A. That's right, and in Tacoma, about half of the 1,500 individuals are detained under 1226A, because they're not able to meet that burden of showing that they're not a flight risk, or a danger to the community, so that they can get a bond that they can post. What would happen to your class, say we say, I know you want us to say immediate means literally, but on that moment, but if we think it's 24 hours or something, is there a mechanism as a practical matter with your class at this point that you could deal with a decision like that? What would happen if we say immediate means 24 hours, just as a hypothetical? As long, I think if there's still that clear rule that it's 24 hours, that immigration keeps records of when they take the individual into custody, and they would then have the capacity of demonstrating, hey, this person still falls under mandatory detention, because even though we didn't get him from Yakima County Jail, we picked him up at 845 the next morning, and that was within eight and a half hours. But your class definition, so, I mean, they haven't appealed class certification. I'm just trying to figure out, like, what would happen if we kind of mess with your class definition at this point? Have they waived that by not appealing the class cert? They have waived that. They haven't touched any finding with regards to class certification. Theoretically, I think the court could say, well, what does immediately read, and clarify that we are interpreting immediately to mean this. And so that wouldn't really change the definition literally, but would change the number of people that are in it, and that could still happen in this litigation, potentially. That's correct. All right. Thank you very much. Thank you. Very interesting arguments. I think you're over your time, but as I indicated, we are going to have an opportunity to speak with Mr. Chen again. So you can come up on the next case, which is Priyat v. Johnson. Thank you.
judges: Kleinfeld, Nguyen, Friedland